*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★  ★ ★ ★

# OPINION

No. 04-08-00702-CR

Chris Joshua **MEADOUX**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 289th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-8922
Honorable Carmen Kelsey, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:       Phylis J. Speedlin, Justice
               Rebecca Simmons, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  December 9, 2009

AFFIRMED

This appeal arises out of a capital murder conviction of a juvenile, Chris Meadoux, who was sixteen years old at the time of the offense, but was certified to be tried as an adult.  On appeal, Meadoux raises suppression and sufficiency issues, and challenges the constitutionality of the Texas sentencing scheme that imposes a mandatory life without parole punishment on a juvenile capital murder offender.  We affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 24, 2007 at approximately 3:47 p.m., firefighters responded to a call for a house fire. The fire was located in a locked bedroom on the second story. After firefighters kicked the door in and extinguished the fire, they noticed one body lying on the bed and a second body lying on the floor. The person on the bed, later determined to be Luis Martinez, had two gunshot wounds to the head and a neck laceration; his cause of death was a gunshot wound to the eye. The person on the floor, later determined to be Johnny You, was covered with a blanket, and was positioned with his hands behind his head and his feet crossed; he was taken downstairs to paramedics but it was determined that he was deceased. You had two gunshot wounds to the back of the head and a deep neck laceration; his cause of death was either a gunshot wound to the head or the neck laceration. Neither victim had any defensive wounds, and both had the drug ecstasy in their systems. Fire investigators determined the fire was intentionally set because there were two origination points, the door was closed with a towel or clothing placed at the base, the smoke detector had been removed, and burned articles of clothing were the source of the fire. Four shell casings fired from a .25 caliber gun were recovered from the bedroom; no latent prints were recovered.

The owner of the house, David Larrick, was notified by neighbors of the fire and arrived at the scene. Mr. Larrick called his wife and determined that she and their son, Charles Larrick, were together and away from the house. Charles and his mother had met with his probation officer for twenty minutes at 2:42 p.m. that afternoon. Detectives learned that Luis Martinez had been staying at the Larrick home with the Larricks' permission, but that Johnny You and another boy, Chris Meadoux, had also been staying there the last few days without the Larricks' permission; early in the morning on the day of the murders, You and Meadoux had climbed into Charles' bedroom

through the window. Martinez went to sleep on the bed, while You slept on the floor and Meadoux slept on a futon. When Charles left in the afternoon to go to his probation appointment, Meadoux was awake but the other two boys were still asleep. Charles stated he kept a hunting rifle in his bedroom behind the bed, and that You had a .25 caliber handgun that he had gotten from Meadoux—who had made it known that he wanted the gun back. Both You and Meadoux were associated with gangs. A gun residue test on Charles was negative.

Detectives dispatched Officer Kyle Goodwin to Chris Meadoux's house to determine whether he was there and safe. Goodwin knocked on the door, and Meadoux opened it; as soon as he saw the uniformed officer, Meadoux tried to close the door but Goodwin put his hand in the doorway and pushed it open. Goodwin identified himself and stated he was there to check on Meadoux's welfare because something bad had happened to two of his friends. Officer Goodwin asked Meadoux if he would come down to the station to talk to the detectives, and Meadoux agreed. Because he was only sixteen years old, Goodwin informed him that he needed a parent or guardian to come along. Meadoux's adult brother, Samuel Cordier, was at home and accompanied Meadoux to the police station. Meadoux was told he was not under arrest; he was not patted down or handcuffed, and he and his brother were given the option of driving separately to the police station. They chose to ride with Officer Goodwin. Once at the police station, Meadoux and his brother waited in the lobby near an exit, and then Meadoux was questioned by two separate detectives in an interview room with the door left open much of the time.

At the police station, Meadoux gave two separate statements that were recorded on DVD. The first DVD statement lasts approximately one and one-half hours, and shows Meadoux repeatedly denying any involvement in or knowledge of the murders, but then attempting to destroy evidence

after being told a gun shot residue test (GSR) would be performed on his hands; specifically, the video shows him getting a soda can out of the trash, pouring it over his hands, and rubbing them and scraping them with his teeth during a break while waiting for the GSR test. After the detective confronted him with this conduct, Meadoux continued to deny any knowledge or involvement in the offense; he left the interview room and sat with his brother in the lobby area for approximately ten minutes. Meadoux then agreed to give a second statement. The second DVD lasts approximately half an hour, and contains Meadoux's confession that he accidentally committed the murders when he and You fought over the gun and it discharged, and then he set the fire to cover it up. After his confession, Meadoux was not arrested, but was transported back home with his brother. Meadoux did not receive any *Miranda* warnings or the statutory warnings required for a juvenile in custody under section 51.095 of the Family Code. TEX. FAM. CODE ANN. § 51.095 (Vernon 2008).

In August 2007, Meadoux was arrested and certified to be tried as an adult. He was subsequently indicted for capital murder in two counts alleging alternate manner and means: (1) the murder of Luis Martinez while in the course of committing arson; and (2) the murder of Luis Martinez and Johnny You as part of the same criminal transaction. The trial court held a pre-trial hearing on Meadoux's motion to suppress his oral statements and a *Jackson v. Denno*[1] hearing on the voluntariness of his confession. The court ruled that Meadoux was not "in custody," and his statements were not the product of custodial interrogation and were voluntary; both statements were admitted into evidence at trial and the jury viewed both DVDs. In addition, Sergeant Thomas Matjeka testified that You could not have been shot in the back of the head accidentally as Meadoux claimed; he stated Martinez also could not have been shot in the eye as a result of the gun being

---

[1] *Jackson v. Denno*, 378 U.S. 368 (1964).

dropped and firing accidentally as Meadoux claimed. Matjeka testified in his opinion, based on the trajectories and placement of the gunshot wounds, both boys were laying down at the time they were shot. The blood stain pattern on Meadoux's jeans was not consistent with his story of a struggle and accidental shooting, and Meadoux had no injuries or marks on his hands or arms indicative of a struggle. In addition, GSR particles were recovered from Meadoux's right hand, the jacket he had on at the police station, his jeans, and a shirt. The forensic scientist testified that pouring soda over and rubbing and scrapping the hands would "significantly reduce" any GSR particles. Physical evidence recovered from Meadoux's home included a cell phone belonging to Luis Martinez, a hunting rifle belonging to David Larrick, a .25 caliber handgun whose ballistics matched the recovered shell casings and wounds, and a wooden box with several knives. The blood on Meadoux's jeans was that of Luis Martinez. The medical examiner testified a pocketknife recovered from Meadoux's room could have caused the neck lacerations on the victims. The .25 caliber handgun was tested and did not fire accidentally when dropped. Several calls were made from Martinez's cell phone to Meadoux's girlfriend from 3:42 p.m. to 4:05 p.m. on the afternoon of the murders. Finally, a witness, Jennifer Kerr, testified she was driving through the neighborhood where the murders occurred at about 3:00 or 3:30 p.m. on January 24, 2007, and saw Meadoux walking away from a wooded area behind the houses. Meadoux told her his name was "Max" and he was lost and did not know how to get out of the neighborhood. Kerr gave Meadoux a ride to a nearby grocery store.

Based on this evidence, the jury returned a general verdict finding Meadoux guilty of capital murder; no lesser included offenses were included in the jury charge. Because of his minority, the trial court imposed the mandatory sentence of life imprisonment without the possibility of parole.

*See* TEX. PENAL CODE ANN. § 8.07(c) (Vernon Supp. 2009) (prohibiting punishment by death for a person younger than 18 years at the time of the offense); TEX. CODE CRIM. PROC. ANN. art. 37.071 § 1 (Vernon Supp. 2009) (prescribing a mandatory sentence of life without parole for defendants convicted of a non-death penalty capital felony); *see also* Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 1, 2005 Tex. Gen. Laws 2705 (amended 2009) (current version at TEX. PENAL CODE ANN. § 12.31(a) (Vernon Supp. 2009)). Meadoux timely appealed.

On appeal, Meadoux claims that: (1) the trial court erred in denying his motion to suppress his confession, and in refusing to submit a jury instruction on the voluntariness of his statement; (2) the evidence is legally and factually insufficient to establish the elements of capital murder as set out in the indictment; and (3) the Texas sentencing scheme of automatic life without parole for a juvenile convicted of capital murder constitutes cruel and unusual punishment in violation of the federal and state constitutions.

## CONFESSION (SECOND STATEMENT)

In two issues on appeal, Meadoux asserts that the trial court erred in denying his motion to suppress his second[2] statement, and in denying his request for a jury instruction on the voluntariness of his statement. Specifically, Meadoux contends his second statement confessing to the murders/arson was the product of custodial interrogation and coercion, and was therefore not voluntary. The State responds that Meadoux was not "in custody," was not coerced, and his confession was voluntary, and therefore properly admitted into evidence. As to the jury instruction, the State asserts that article 38.22 of the Code of Criminal Procedure does not apply when the

---

[2] On appeal, Meadoux only challenges the denial of his motion to suppress as to his second statement (the confession), even though his first statement was also admitted and the jury viewed the DVD of him engaging in incriminating conduct, *i.e.*, the attempted removal of GSR from his hands in the interview room.

statement did not stem from custodial interrogation. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005).

 ***Motion to Suppress Second Oral Statement.*** We review a trial court's ruling on a motion to suppress for an abuse of discretion, viewing all the evidence in the light most favorable to the court's ruling. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) ("party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences"); *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). We afford almost total deference to the trial court's determination of historical facts supported by the record, but review its application of the law to the facts *de novo*. *Garcia-Cantu*, 253 S.W.3d at 241; *see Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). When a trial court does not make explicit findings of fact, we assume the court made implicit findings of fact in support of its ruling as long as those findings are supported by the record. *Garcia-Cantu*, 253 S.W.3d at 241; *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). If the trial court's decision is correct on any theory of law applicable to the case, its decision will be upheld. *Ross*, 32 S.W.3d at 855-56; *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003). This deferential standard of review applies regardless of whether the court granted or denied the motion to suppress.[3] *Garcia-Cantu*, 253 S.W.3d at 241.

 **1. Custodial Interrogation.** The admissibility of a statement made by a juvenile is governed by section 51.095 of the Texas Family Code. TEX. FAM. CODE ANN. § 51.095. The statute

---

[3] A ruling on a motion to suppress in a juvenile case is reviewed using the same standard of review that applies in an adult criminal case. *In re R.J.H.*, 79 S.W.3d 1, 6-7 (Tex. 2002). Here, the trial court initially held a suppression hearing in Meadoux's juvenile case and ruled his statements were not the product of custodial interrogation. The court held another suppression/*Jackson v. Denno* hearing in Meadoux's adult criminal case, and reconsidered the issue of whether he was "in custody" at the time he made the statements, ruling he was not. The court took judicial notice of the testimony from the juvenile suppression hearing. Thus, the suppression ruling being reviewed on appeal arises out of the adult criminal case.

provides that a juvenile's recorded oral statement is admissible only if the specified *Miranda*-based warnings are given by a magistrate prior to the statement. *Id.* § 51.095(a)(5). If a juvenile is not "in custody," however, the statutory warnings are not necessary for admission of the juvenile's statement. *Id.* § 51.095(a)(1)(A), (d) (providing that the warnings must precede statements made while the juvenile is in a detention facility or other place of confinement, in the custody of an officer, or in the possession of the Department of Protective and Regulatory Services). A voluntary oral statement by a juvenile that does not stem from custodial interrogation is admissible, even if the juvenile did not receive the statutory admonishments. *Id.* § 51.095(b)(1), (d); *Martinez v. State*, 131 S.W.3d 22, 32 (Tex. App.—San Antonio 2003, no pet.). It is undisputed that Meadoux never received any admonishments of his rights. We must determine whether the trial court correctly applied the relevant law to the facts of the case in ruling that Meadoux was not "in custody" when he gave his statement.

Custodial interrogation is questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *Martinez*, 131 S.W.3d at 32 (citing *Cannon v. State*, 691 S.W.2d 664, 671 (Tex. Crim. App.1985)). A child is under interrogation if he is subjected to direct questioning or its functional equivalent, which occurs when police officers engage in conduct that they know is likely to elicit an incriminating response. *Lam v. State*, 25 S.W.3d 233, 239 (Tex. App.—San Antonio 2000, no pet.). A child is in custody if, under the objective circumstances, a reasonable child of the same age would believe his freedom of movement was restrained to the degree associated with a formal arrest. *Martinez*, 131 S.W.3d at 32; *see Jeffley v. State*, 38 S.W.3d 847, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

In determining whether a child was in custody at the time of questioning, we apply a two-step analysis. *Martinez*, 131 S.W.3d at 32; *In re M.R.R., Jr.*, 2 S.W.3d 319, 323 (Tex. App.—San Antonio 1999, no pet.). First, we examine all the circumstances surrounding the questioning to determine whether there was a formal arrest or restraint of freedom of movement to the degree associated with a formal arrest. *Martinez*, 131 S.W.3d at 32 (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)). In making this initial determination, we focus on the objective circumstances of the interrogation, not on the subjective views of the officer or the individual being questioned. *Martinez*, 131 S.W.3d at 32. "[T]he restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).

Second, in light of those circumstances, we consider whether a reasonable person would have felt free to terminate the interrogation and leave. *Martinez*, 131 S.W.3d at 32 (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Courts have traditionally considered four factors in making this determination: (1) whether probable cause to arrest existed at the time of questioning; (2) the subjective intent of the police; (3) the focus of the investigation; and (4) the subjective belief of the defendant. *Id.*; *Dowthitt*, 931 S.W.2d at 254. However, because the custody determination is to be based entirely upon objective circumstances, the subjective intent of both the police and the defendant is irrelevant except to the extent the intent may be manifested in their words or actions. *Martinez*, 131 S.W.3d at 32; *Dowthitt*, 931 S.W.2d at 254. When the circumstances show that a person is acting upon the invitation or request of the police, and there are no express or implied threats to take him by force, then that person is not in custody at that time. *Martinez*, 131 S.W.3d at 32; *Dancy v. State*, 728 S.W.2d 772, 778-79 (Tex. Crim. App. 1987). Merely being the focus of

a criminal investigation does not amount to being in custody. *Meek v. State*, 790 S.W.2d 618, 620 (Tex. Crim. App. 1990). Moreover, being questioned at the police station does not, by itself, constitute being in custody. *Dowthitt*, 931 S.W.2d at 255.

In concluding that Meadoux was not in custody at the time of his statement, and that his statement was voluntary and not the product of custodial interrogation, the trial court made the following findings of fact on the record: (i) there was no parent involved, but an adult brother accompanied Meadoux to the police station; (ii) he went with the police after they asked him to; (iii) he and his brother were given an opportunity to drive their personal vehicle or ride with the officer; (iv) he was not searched or handcuffed; (v) he was considered a suspect but was not read his rights; (vi) no weapons were drawn; (vii) the reason the police went to Meadoux's house was because they had information he was with two individuals who were found dead in a house fire, a missing person report had been filed by Meadoux's mother, and they were conducting an investigation to determine Meadoux's safety; and (viii) at the police station, the door was left open numerous times and Meadoux was told he would be free to leave after the questioning and did leave. All of the court's fact findings are supported by the record of the motion to suppress hearing, and we therefore afford almost total deference to these facts. *Garcia-Cantu*, 253 S.W.3d at 241.

Applying the first part of the analysis, we examine all the circumstances surrounding Meadoux's questioning to determine whether there was a formal arrest or restraint to the degree associated with a formal arrest. Here, it is undisputed that Meadoux was never placed under formal arrest or handcuffed; in fact, after he gave his confession, he and his brother were transported back home. Officer Goodwin, who was in uniform and driving a marked patrol car, testified he never pulled out his gun or any handcuffs, and Meadoux was repeatedly told he was not under arrest at his

home before going to the station. Goodwin also stated he informed Meadoux he did not have to come down to the police station, but Meadoux agreed to do so; he and his brother were given the option of driving themselves but chose to ride with the officer; they were not patted down or handcuffed at any time; and they initially waited in the lobby area near an exit door at the station. Sergeant Matjeka, one of two detectives who separately interviewed Meadoux at the station, testified that Meadoux was informed he was not under arrest and was "free to leave" about thirty times during the two interviews. Matjeka personally told Meadoux he was "free to go" six times during their forty-minute interview. Meadoux was never restrained or handcuffed, and he was left alone in the interview room with the door open much of the time, with access to the building exits; he was questioned by only one detective at a time. Matjeka stated that during the interviews Meadoux never stated he wanted to leave or asked for an attorney. After the first interview, Meadoux sat and talked with his brother in the lobby area for about ten to fifteen minutes while transport home was being arranged. Matjeka conceded there was some delay because an officer had to be available to drive them home; it was at that point that Meadoux decided to talk to the detectives again, and made his confession to Matjeka. Matjeka testified that Meadoux was never given any *Miranda* warnings because he was not in custody. Finally, Meadoux himself states several times on the DVD that he is aware that he is not under arrest and is free to leave. Based on all the objective circumstances surrounding the questioning, Meadoux was not under formal arrest or a restraint of freedom to the degree associated with a formal arrest. *Martinez*, 131 S.W.3d at 32.

Turning to the second part of the analysis involving the four factors, we examine whether a reasonable sixteen-year-old in the same circumstances as Meadoux would have felt free to terminate the interview and leave. *Id.* In making this determination, we look first to the objective factors of

whether the officers had probable cause to arrest Meadoux at the time of his questioning and whether he was the focus of the investigation. Goodwin stated that he was dispatched to Meadoux's house by the homicide detectives for the dual purpose of checking on Meadoux's welfare and, if he was at home, asking him to go to the police station to discuss what happened at the Larrick house that day. Goodwin explained that at the time he only knew "there was a house fire that had bodies in it. And [the detectives] didn't know whether or not [Meadoux] was there, whether he was hurt, whether he was missing or possibly a suspect." Goodwin stated that once he verified that Meadoux was safe and at home, he called the detectives and they instructed him to ask Meadoux to come to the station because they wanted to find out what Meadoux knew about the events at the house fire; they did not know what his involvement might have been—they only knew he had been at the house with the other boys that day. There was no other evidence pointing to Meadoux at the time of his questioning, other than his presence at the house; it was only after he gave his confession that probable cause to arrest him arose. Although he was a suspect, Meadoux was not the sole focus of the investigation. Charles Larrick was also tested for gun shot residue, and was a potential suspect until the GSR test came back negative and his alibi of being at the probation office was confirmed.

As to the subjective intent of the police as manifested by their objective words and actions, Officer Goodwin testified that when Meadoux opened the front door and saw a uniformed officer, he immediately tried to close the door; Goodwin stated he put his hand in the doorway and stopped the door from closing, pushing it open, for reasons of "officer safety" in that he knew a violent act had occurred but did not know the extent of Meadoux's involvement. After Goodwin verified Meadoux's identity, he explained to Meadoux that "something bad" had happened to some of his friends, and that he needed to make sure Meadoux was okay; Meadoux answered, "No, I'm fine."

Goodwin then told Meadoux that some detectives wanted to speak with him and asked him to go down to the police station, and Meadoux said, "Oh, okay." Goodwin testified he then followed Meadoux into the front living room of the house and waited while Meadoux got ready; his backup officer had arrived and waited at the front door threshold. Neither officer drew their gun or had their handcuffs out. Goodwin did have his flashlight on because it was dark in the house and he did a protective sweep of the room for any weapons or other potential dangers to the officers. When Meadoux went upstairs to get his shoes, Goodwin followed him and waited at the top of the stairs, again for reasons of officer safety. Goodwin explained to Meadoux that since he was a minor a parent or guardian had to accompany him to the police station, and his brother Samuel did so. Goodwin testified that he told them while at the house, "you don't have to go with me if you don't want to," and made it "very clear" that it was "only by choice" that they were going to the police station. Goodwin gave them the option to drive separately, but they declined and chose to ride with him; he did not frisk them before they got in his patrol car as he usually would, although the back seat doors do not open from the inside. Goodwin stated Samuel and Meadoux agreed to go with him voluntarily; he did not handcuff them or put them in custody or "make them feel like it;" Goodwin said they "laughed and joked the whole time." At the station, Meadoux and Samuel waited in a lobby area with access to nearby exits.

Sergeant Matjeka stated that during the entire time Meadoux was at the police station he was not under arrest or in custody, and was free to leave at any time. Matjeka testified he repeatedly told Meadoux that he was not under arrest and was free to go; he further told Meadoux repeatedly that he would not be arrested that night no matter what he said to the detectives. Meadoux was never restrained or handcuffed or read his rights. The door to the interview room was left open much of

the time and Meadoux was left in the room unguarded; he left the room and sat with Samuel in the lobby area in between the two interviews. Samuel walked outside the police station to smoke several times. Further, Meadoux was, in fact, not arrested after his confession but was transported home with his brother. As to Meadoux's subjective beliefs manifested by his words and actions, the DVD shows Meadoux acknowledging several times that he is not under arrest and is free to leave. Meadoux never states that he wants to leave or stop the interview.[4] In fact, after being confronted with his "hand-washing" and then speaking to his brother, Meadoux chose to talk to Matjeka a second time and confess that the shootings were accidental. Meadoux did not testify at the suppression hearing, but his brother Samuel testified he personally did not give the officers permission to enter the house, and Samuel's girlfriend testified the officer who later came to pick her up did not give her a choice about coming with him. Considering all the circumstances and the four traditional factors, we conclude a reasonable sixteen-year-old in the same situation as Meadoux would have felt free to terminate the questioning and leave. *See id.*

The circumstances of Meadoux's case are distinguishable from *In re S.A.R.*, 931 S.W.2d 585, 587 (Tex. App.—San Antonio 1996, writ denied), in which this court held that a juvenile was in custody where she was taken to the police station by four officers in a marked patrol car, was photographed and fingerprinted at the station, was informed she was a suspect for capital murder, and was questioned by three officers in a small room. These facts, combined with the fact that the investigation focused on S.A.R., caused this court to hold that a reasonable person in that situation

---

[4] The DVD shows Matjeka asking Meadoux, as part of his interview tactics, if he is "ready to go?" and Meadoux answering, "yes," before Matjeka tells him, "I'm not gonna talk to you no more. I'm not even gonna try. If you want to talk to me and tell me what happens [sic] then you better stop me sometime before I leave . . . ." At another point, Meadoux asks Matjeka, "We gonna go now?" Matjeka answers, "yeah," but then states they have to wait for the GSR technician to test his hands.

would have believed their freedom of movement was significantly restricted. *Id.* (pre-dating adoption of the "reasonable child of the same age" definition of juvenile custody). Indeed, the circumstances of Meadoux's case are more similar to those in *Martinez*, in which this court held the fifteen year-old juvenile was not in custody at the time of his statement. *See Martinez*, 131 S.W.3d at 33. There, Martinez voluntarily agreed to accompany plain clothes officers to the police station, and was informed he could drive himself or ride with the officers. *Id.* He was specifically advised that he was not under arrest before he left home, and was never handcuffed. *Id.* He was told by a detective that no matter what he said he would not be arrested that day; he was placed in an interview room with one detective, with whom he cooperated and gave a written statement. *Id.* He agreed to let the detectives take a photograph of him before he was transported home. *Id.* The main difference between *Martinez* and Meadoux's case is that Martinez's mother separately accompanied him to the police station, and agreed that he could give a statement. *Id.* In Meadoux's case, his adult brother, Samuel, accompanied him as his guardian.

Based on the totality of the circumstances here, Meadoux was not under arrest or restrained to the degree of an arrest, and a reasonable sixteen-year old child would have had the ability to terminate the interview and leave; therefore, he was not in custody. *See id.* at 35. Because Meadoux was not in custody when he made his oral confession, the requirement that a magistrate give him the warnings set forth in section 51.095(a)(1)(A) of the Family Code did not apply to him. *See In re R.A.*, No. 03-04-00483-CV, 2005 WL 1412119, at *3 (Tex. App.—Austin June 15, 2005, no pet.) (denial of motion to suppress based on failure to give Section 51.095 warnings was proper because custody is a precursor to the warning requirements of Section 51.095 and juvenile was not in custody).

*2. Voluntariness of Confession.*     Even in the absence of custody, due process may be violated by admitting confessions that are not voluntarily given. *Martinez*, 131 S.W.3d at 35; *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996).  A statement is not voluntary if there was "official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State,* 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).  When voluntariness is challenged by the defendant, the State bears the burden of proving by a preponderance of the evidence that the statement was given voluntarily. *Id.*  The trial court is the sole judge of the weight and credibility of the evidence, and the trial court's finding on voluntariness may not be disturbed on appeal absent an abuse of discretion. *Id.*; *Martinez*, 131 S.W.3d at 35.

Meadoux argues the entire chain of events leading to his confession was triggered by Officer Goodwin's illegal conduct in preventing him from closing the door to his own home.  As discussed *supra*, Goodwin testified that he stopped Meadoux from closing the door by putting his hand on the door and pushing it open, and later followed him into the front room, for reasons of "officer safety" because he did not know the nature of Meadoux's involvement with the two dead bodies, but knew "some sort of violent act had taken place."  Even if Goodwin's warrantless entry across the home's threshold, and later into the home itself, can be viewed as an illegal forced entry with a causal connection to Meadoux's confession, the record shows the taint of the illegal entry was sufficiently attenuated by intervening circumstances and the passage of time before Meadoux voluntarily gave his confession—by that point he had been told numerous times by both Goodwin and Matjeka, both at his house and the police station, that he was not under arrest or in custody, and was free to refuse to go to the police station, and once there free to leave. *See Wilson v. State*, 277 S.W.3d 446, 448

(Tex. App.—San Antonio 2008, pet. granted) (citing *Johnson v. State*, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994), for the four factors to be considered under the attenuation doctrine: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the illegal conduct and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct).

Finally, Meadoux asserts he was coerced into giving the confession because he repeatedly denied involvement for an hour and a half, and his departure was delayed while waiting for the gun shot residue test and a ride home. The record contains no evidence the officers threatened or coerced Meadoux into confessing, or that his will was overborne by the officers' actions; rather, it was Meadoux's own conduct in trying to clean any gun shot residue from his hands which was caught on video, and his subsequent discussion with his brother in the lobby, that ultimately led to his confession. *See Wyatt v. State*, 23 S.W.3d 18, 23-25 (Tex. Crim. App. 2000) (rejecting appellant's claim that his confession was coerced because the interrogating officers called him a liar and "talked short" to him).

***Conclusion.*** We conclude the trial court did not abuse its discretion in ruling that Meadoux was not in custody and that his confession was voluntary, and thus did not err in denying Meadoux's motion to suppress the second statement.

### *Jury Instruction on Voluntariness of Statement.*

Meadoux also argues that a voluntariness instruction should have been included in the jury charge under article 38.22 § 6 of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6 (Vernon 2005) (providing that upon the trial court's finding that a statement was voluntary, evidence pertaining to voluntariness may be submitted to the jury and it shall be instructed

that unless it believes beyond a reasonable doubt that the statement was voluntarily made, it shall not consider the statement or any evidence obtained as a result thereof).  The State correctly responds that article 38.22 applies only to statements that arise out of custodial interrogation.  Because Meadoux was not in custody when he made his confession, the question of whether the jury should have received an instruction on the voluntariness of that statement is moot.  *Martinez*, 131 S.W.3d at 36; *Land v. State*, 943 S.W.2d 144, 149 (Tex. App.—Houston [1st Dist.] 1997, no pet.).  We therefore overrule this issue.

## SUFFICIENCY OF THE EVIDENCE

In two issues, Meadoux next asserts the evidence is legally and factually insufficient to support his conviction for capital murder because (i) the evidence did not show he had the intent to commit arson at the time he was committing the murders, and (ii) the evidence did not show he intentionally caused Martinez's death, only You's death.  The State responds that the evidence is clearly legally and factually sufficient to prove the second of the alternate means—that the two murders were committed during the same criminal transaction, and that is all that is required.

In reviewing legal sufficiency, we consider all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The jury is permitted to make reasonable inferences from the evidence, and, as the trier of fact, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony.  *Mosley v. State*, 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998).  We resolve any inconsistencies in the testimony in favor of the verdict.  *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  In reviewing factual sufficiency, we consider all the

evidence in a neutral light, giving almost complete deference to the jury's determinations of credibility. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We will reverse the conviction only if the evidence in support of the verdict, although legally sufficient, is so weak that the verdict is clearly wrong and manifestly unjust, or if, considering conflicting evidence, the verdict is outweighed by the great weight and preponderance of the evidence. *Id.*; *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

In the indictment, the State charged Meadoux with two alternative means of committing capital murder: (1) intentionally and knowingly causing the deaths of Luis Martinez and Johnny You by shooting and cutting them with a deadly weapon during the same criminal transaction, or (2) intentionally and knowingly causing the death of Luis Martinez by shooting and cutting him with a deadly weapon while in the course of committing the offense of arson of a building. TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2), (7)(A) (Vernon 2003 & Supp. 2009) (providing a person commits capital murder by committing murder in the course of another crime like arson, or by murdering more than one person during the same criminal transaction). The jury was instructed in the disjunctive to find Meadoux guilty of capital murder if they found beyond a reasonable doubt that he committed either of the two means of the offense. The jury returned a general "guilty" verdict.

When the court's charge authorizes the jury to convict the defendant on alternative theories, we will uphold the jury's guilty verdict if the evidence is sufficient on any one of the theories. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005); *Rabbani v. State*, 847 S.W.2d 555, 558-59 (Tex. Crim. App. 1992). In its brief, the State only argues the evidence is sufficient under the "same criminal transaction" theory. With respect to that theory, Meadoux asserts there is "no evidence" that he intentionally caused Martinez's death because all of his statements about the incident

involved fighting with You; Martinez was not involved in the alleged struggle and his death could have been accidental.

The record does contain both legally and factually sufficient evidence to prove that Meadoux intentionally and knowingly killed Martinez during the same criminal transaction in which he killed You. Besides the other evidence detailed above that was inconsistent with Meadoux's defense of an accidental discharge (most critically that You was shot twice in the back of the head), there was testimony that the .25 caliber handgun used in the killings did not fire accidentally when dropped by an investigator. Further, there was testimony that if two people were fighting over the gun when it fired, someone's hands would likely get "hurt from the slide," and Meadoux had no marks or injuries on his hands or arms. In addition, Sergeant Matjeka testified that You could not have been shot in the back of the head during a struggle over the gun, and Martinez could not have received the wound to his eye from a gun being dropped on the floor and accidentally firing as described by Meadoux; further, You had no defensive injuries. Most importantly, Martinez was shot *twice*—once in the left eye and once in the neck. Finally, Meadoux admitted cutting Martinez's throat, as well as You's throat, because he did not want to leave a witness behind; the medical examiner testified You was still alive when his neck was cut and Meadoux stated he cut You's throat because "he was still breathing." Meadoux also admitted setting the fire to cover up the deaths.

As for any "contrary evidence" to be considered in a factual sufficiency review, the lack of powder tattooing around Martinez's wounds indicated the gun was fired from over three and a half feet away, and there were fibers in one wound indicating the bullet passed through something like a pillow or comforter. Sergeant Matjeka testified that, based on the trajectory of the wounds, Martinez was lying down when he was shot.

The jury was entitled to infer Meadoux's intent to kill Martinez from all of his conduct, including his act of slitting Martinez's throat to make sure he was dead and setting the fire to cover up the deaths. *Sorto*, 173 S.W.3d at 475 (jury may infer intent to kill from defendant's words and conduct); *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Moreover, the jury was entitled to believe or disbelieve all or part of Meadoux's statements, and to assess the weight and credibility of the other evidence and resolve any conflicts in the evidence. *Sorto*, 173 S.W.3d at 475.

***Conclusion.*** Based on our review of the record, we conclude the evidence is both legally and factually sufficient to prove Meadoux committed capital murder by intentionally and knowingly killing two people during the same criminal transaction.

### SENTENCING: AUTOMATIC LIFE WITHOUT PAROLE FOR JUVENILE

Finally, Meadoux challenges the constitutionality of the Texas sentencing scheme mandating that, even though he was sixteen years old at the time of the offense, he be automatically sentenced to life without parole. Specifically, Meadoux argues the capital murder sentencing scheme for a juvenile tried as an adult constitutes "cruel and unusual" punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and article I, section 13 of the Texas Constitution. U.S. CONST. amends. VIII and XIV; TEX. CONST. art. I, § 13.

Meadoux bases his argument on recent actions taken by the United States Supreme Court in ruling that execution of a juvenile is unconstitutionally "cruel and unusual" in *Roper v. Simmons*, 543 U.S. 551 (2005), and in recently granting review in two Florida cases[5] on the question of

---

[5] On November 9, 2009, the United States Supreme Court heard oral arguments in *Sullivan v. Florida*, 987 So.2d 83 (Fla. Dist. Ct. App. 1st Dist. 2008), *cert. granted*, 129 S.Ct. 2157 (May 4, 2009) (No. 08-0762), and *Graham v. Florida*, 982 So.2d 43 (Fla. Dist. Ct. App. 1st Dist. 2008), *cert. granted*, 129 S.Ct. 2157 (May 4, 2009) (No. 08-7412). The Court's decisions are currently pending.

whether life without parole for a non-homicide offense committed by a juvenile is "cruel and unusual." The Supreme Court also recently ruled that the Eighth Amendment prohibits the execution of a mentally retarded person. *See Atkins v. Virginia*, 536 U.S. 304 (2002).

The Eighth Amendment guarantees individuals the right not to be subjected to excessive or cruel and unusual punishment. U.S. CONST. amend. VIII. A punishment is "excessive," and therefore prohibited by the Eighth Amendment, if it is not graduated and proportioned to the offense. *Atkins*, 536 U.S. at 311 (citing *Weems v. United States*, 217 U.S. 349, 367 (1910)); *Roper*, 543 U.S. at 560. An excessiveness claim is judged by currently prevailing standards of decency. *Atkins*, 536 U.S. at 311-12. Proportionality review under such evolving standards of decency "should be informed by 'objective factors to the maximum possible extent.'" *Id.* at 312. The Supreme Court has stated that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Id.* In addition to objective evidence, the Constitution contemplates that the Supreme Court will bring its own judgment to bear "by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators." *Id.* at 313; *see Roper*, 543 U.S. at 564-578 (holding that both objective indicia of consensus, as expressed by enactments of legislatures that have addressed the issue, and the Court's own independent judgment demonstrate that the death penalty is a disproportionate punishment for juveniles). Thus, in reviewing the constitutionality of a sentencing statute, an appellate court considers: (1) the gravity of the offense relative to the harshness of the penalty; (2) the sentence compared to that received by others in the same jurisdiction; and (3) the sentence compared to similar sentences in other jurisdictions. *Speer v. State*, 890 S.W.2d 87, 92 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) (citing *Solem v. Helm*, 463 U.S. 277, 290 (1983)).

Meadoux argues that the same reasoning used by the Supreme Court in *Roper* to find execution of a juvenile "cruel and unusual" applies to a mandatory sentence of life without parole for a juvenile. *See Roper*, 543 U.S. at 569-70 (citing three reasons for declining to classify juveniles as the "worst offenders" worthy of the death penalty: (1) lack of maturity and an underdeveloped sense of responsibility; (2) susceptibility to outside pressures; and (3) the less than fully-formed nature of their characters). The Supreme Court in *Roper* also considered the "evolving standard of decency," noting that almost all other countries prohibit the execution of juveniles. *Id.* at 561. The Supreme Court affirmed the Missouri Supreme Court's modification of the juvenile's sentence from death to life without the possibility of parole, but did not address the issue of the constitutionality of a life without parole sentence for a juvenile. *Id.* at 560; *but see Harmelin v. Michigan*, 501 U.S. 957, 995-96 (1991) (sentencing scheme that calls for an automatic life without parole sentence, rather than an individualized punishment determination, is not "cruel and unusual").

The State responds that it is up to the Texas legislature to choose to amend the sentencing procedure for a juvenile capital murderer, and that several Texas courts of appeals have upheld the constitutionality of a life without parole sentence for a juvenile convicted of capital murder. *See Ex parte Moser*, 602 S.W.2d 530, 533 (Tex. Crim. App. 1980) (legislature may alter or abolish the procedure whereby the jury assesses a defendant's punishment within the bounds of due process and other constitutional strictures). The Texas sentencing scheme for capital murder provides that upon conviction an adult offender may receive one of two possible punishments: death or life imprisonment without parole. TEX. PENAL CODE ANN. § 12.31(a); TEX. CODE CRIM. PROC. ANN. art. 37.071 §§ 1, 2 (Vernon Supp. 2009). A juvenile who has been certified to stand trial as an adult for capital murder may not be sentenced to death; therefore, the juvenile must be sentenced to the

lesser punishment, life imprisonment without parole. TEX. PENAL CODE ANN. § 8.07(c). In upholding the constitutionality of this sentencing scheme for juveniles, our sister courts of appeal have stated that, "[p]resumably, the law statutorily considers youth in mitigation of the death penalty and thereby mandates the lesser of the two possible punishments for capital murder." *Laird v. State*, 933 S.W.2d 707, 714-15 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (quoting *Prater v. State*, 903 S.W.2d 57, 60 (Tex. App.—Fort Worth 1995, no pet.)); *see Speer*, 890 S.W.2d at 92-93 (upholding constitutionality of mandatory life for juvenile capital murderer and holding that mitigating evidence such as prior abuse of juvenile may be considered by jury during trial in determining whether juvenile committed capital murder or lesser offense); *see also Barnes v. State*, 56 S.W.3d 221, 239 (Tex. App.—Fort Worth 2001, pet. ref'd) (imposition of automatic life sentence on juvenile is not unconstitutional). In addition, at least two Texas courts of appeal have recently rejected a juvenile's argument that a mandatory life sentence upon conviction for capital murder is unconstitutional based on the Supreme Court's reasoning in *Roper*; the Court denied certiorari in one of the cases. *See Willis v. State*, No. 06-04-0172-CR, 2005 WL 2086327, at *3 (Tex. App.—Texarkana Aug. 31, 2005, no pet.) (mem. op., not designated for publication); *Thomas v. State*, No. 14-06-00066-CR, 2007 WL 2238890, at *5 (Tex. App.—Houston [14th Dist.] Aug. 7, 2007, pet. ref'd), *cert. denied*, 129 S.Ct. 51 (2008) (mem. op., not designated for publication).

As the State notes, the Texas legislature recently amended section 12.31 of the Penal Code to restore parole eligibility for juvenile capital murder offenders who are certified as adults for trial; however, the legislature chose not to make the law retroactive, restricting it to juvenile offenders who commit capital murder on or after September 1, 2009. *See* TEX. PENAL CODE ANN. § 12.31(a) (Vernon Supp. 2009) (providing for a mandatory life sentence, with the option of parole, for a

juvenile whose case is transferred under section 54.02 of the Family Code). Given that the legislature chose not to apply the parole eligibility amendment retroactively to juveniles who have already been sentenced for a capital murder, it would not be appropriate for this court to "judicially amend" the statute. TEX. GOV'T CODE ANN. § 311.022 (Vernon 2005) (statute is presumed to be prospective unless expressly made retrospective).

*Conclusion*. We conclude that the Texas sentencing scheme mandating life without parole for a juvenile convicted of capital murder does not constitute "cruel and unusual" punishment in violation of the state and federal constitutions. *Harmelin*, 501 U.S. at 995-996.

## CONCLUSION

Based on the foregoing analysis, we hold that Meadoux's confession was not the product of custodial interrogation and was voluntary, the evidence is legally and factually sufficient to support his conviction for capital murder, and his sentence of life imprisonment without parole is not unconstitutional. Accordingly, we affirm the trial court's judgment.


Phylis J. Speedlin, Justice


PUBLISH