# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00080-CV

## In the Matter of C. M. A.

## FROM THE DISTRICT COURT OF MILAM COUNTY, 20TH JUDICIAL DISTRICT
## NO. JV01408, HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found that appellant C.M.A., a juvenile, had committed the offenses of burglary of a habitation and aggravated sexual assault of a child. Based on the jury's findings, the district court adjudicated C.M.A. delinquent and committed him to confinement in the Texas Juvenile Justice Department for an indeterminate period of time not to exceed the time when he shall be 19 years of age. In two issues on appeal, C.M.A. asserts that the district court abused its discretion in denying a motion to suppress concerning statements he had made to authorities tending to implicate himself in both offenses. We will affirm the district court's judgment.

## BACKGROUND

In considering the motion to suppress, the district court heard evidence from two witnesses: Deputy Johnny Beathard of the Milam County Sheriff's Office, who had interviewed C.M.A. concerning both offenses, on separate dates for each; and Robert Hollas, an investigator with Child Protective Services who was present during the interview relating to the alleged sex offense. Both Beathard and Hollas testified at the hearing on the motion to suppress and again

at trial, and C.M.A. re-urged his motion to suppress following their relevant trial testimony. The district court denied the motion to suppress on both occasions—following the suppression hearing and again during trial. Accordingly, the following factual summary is taken from the evidence that the district court considered at both the suppression hearing and at trial.[1]

According to the evidence presented, at the time of the interviews, C.M.A. was fourteen years old and attended Milano High School. Both interviews took place at the high school, in a room inside the principal's office that Beathard described as "a counselor's office" that is "set up like a conference room," and that Hollas described as "part of a break room or something." At the suppression hearing, Beathard described the size of the room as "probably 25 to 30 feet long by about 15 to 20 feet wide."[2] Beathard testified that the room had windows, along with an "observation window in the door" to the room. Beathard added that the room had a "big table like a conference room has" and that, during both interviews, C.M.A. was seated at the table. According to Beathard, C.M.A. was seated closest to the door in both interviews.

During the first interview—the one in which Bearthard but not Hollas participated—Beathard indicated that he was seated across the table from C.M.A. In the second

---

[1] In reviewing a trial court's ruling on a motion to suppress, "we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later." *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). "However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually re-litigated by the parties during trial on the merits." *Id*. "Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review." *Id*.

[2] At trial, Beathard described the dimensions of the room as "approximately 20 to 30 feet long by about ten to 15 feet wide."

interview, according to Hollas, Hollas was seated across the table from C.M.A., while Beathard was "off to the side" but also seated at the table. Beathard further testified that prior to both interviews, C.M.A. was escorted to the room by school personnel (either the principal or the principal's secretary),[3] the door to the room was closed but remained unlocked, and C.M.A. was not handcuffed.

The first interview, the one relating to the burglary charge, occurred on September 28, 2011. According to Beathard, he had received information that C.M.A. may have participated in the burglary with another juvenile, and he wanted to speak to C.M.A. about the property that had allegedly been stolen. Beathard testified that, at the beginning of the interview, he introduced himself to C.M.A. (even though, according to Beathard, C.M.A. "already knew who [Beathard] was"),[4] "spoke with him a little bit, advised him that I needed to speak with him, that he wasn't under arrest and he didn't have to talk to me if he didn't wish to." Beathard also testified that he had told C.M.A. that he was free to leave the room, but, according to Beathard, C.M.A. informed him that he was willing to speak to him. When asked to describe his own appearance during the interview, Beathard testified that he was five feet, eight inches tall and weighed approximately 210 pounds. Beathard could not recall whether he was dressed in his uniform or in plainclothes at the time of the interview, but he did remember that he was wearing both his badge and his firearm (although no testimony was elicited as to whether the firearm was visible to C.M.A.). Beathard acknowledged that, at the time of the interview, C.M.A was a suspect in the burglary

---

[3] Beathard agreed with defense counsel's characterization that C.M.A. was "taken out of class and told to come talk to" Beathard.

[4] It is unclear from the record how C.M.A. "already knew" Beathard. However, at the disposition phase of the trial, C.M.A.'s mother testified that Beathard was her nephew.

and that Beathard had communicated that suspicion to C.M.A. Beathard explained that after the interview was complete, C.M.A. was allowed to return to class. The interview lasted approximately thirty minutes.

The interview relating to the sexual-assault charge, the one in which both Beathard and Hollas were present, occurred on October 25, 2011. Beathard and Hollas had received information that C.M.A. had sexually assaulted a ten-year-old child, and they had interviewed the alleged victim before speaking with C.M.A. According to Hollas, the interview with C.M.A. took place at approximately 10:55 a.m., while the interview with the alleged victim had occurred earlier that same morning. When asked to describe his own appearance during the interview, Hollas testified that he was six feet, two inches tall, weighed approximately 260 pounds, and that, during the interview, he was wearing "blue jeans and a shirt." Hollas believed that Beathard was wearing his uniform and his badge at the time of the interview. Hollas further testified that they "were all seated" during the interview and that at no point during the interview did C.M.A. ask to leave the room, go to the bathroom, get a drink of water, or speak with his parents. When defense counsel suggested that C.M.A. was not in the room "of his own free will and accord" because "somebody brought him there," Hollas testified, "Well, they didn't drag him there. He walked in." Hollas also testified that the interview "lasted about 15 minutes, 20 minutes, maybe." When asked if, at any time during the interview, anybody had threatened C.M.A., promised him anything in order to get him to make a statement, or denied him "basic necessities," Hollas testified, "No." Beathard testified similarly.

Beathard and Hollas both testified that, at the time of the second interview, they considered C.M.A. a suspect in the sexual-assault case and that they had communicated their

4

suspicion to C.M.A. Beathard testified that, at the beginning of the interview, he told C.M.A. that he was not under arrest. This time, however, according to Beathard, C.M.A. was not informed that he was "free to leave" the room during the interview. Nevertheless, at the conclusion of the interview, C.M.A. was again allowed to return to class. After the interview was completed, but before C.M.A. left the room, Beathard advised C.M.A. that Beathard "needed to contact [C.M.A.'s] juvenile officer . . . to discuss if we were going to look at having him detained again on [the sexual-assault offense] or if this was going to be brought up in his [delinquency] hearing that was already scheduled." C.M.A. was arrested for the sexual-assault offense later that day, after Beathard had obtained an arrest warrant.

C.M.A.'s statements, which tended to implicate him in the offenses, were admitted into evidence, and the jury subsequently found that C.M.A. had committed the offenses as alleged. Based on the jury's findings, the district court adjudicated C.M.A. delinquent and committed him to the Texas Juvenile Justice Department as noted above. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress for abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *In re R.H.J.*, 79 S.W.3d 1, 6 (Tex. 2002). In other words, we will "overturn the trial court's ruling only if it is outside the zone of reasonable disagreement." *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). On the other hand, "[w]e will sustain the trial court's ruling if that ruling is 'reasonably supported by the record and is correct on any theory of law applicable to the case.'" *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) (quoting *Dixon*, 206 S.W.3d at 590). We must view the evidence in the light

5

most favorable to the trial court's ruling. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). "Thus, the party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Id*. When, as here, the record is silent on the reasons for the trial court's ruling, i.e., there are no explicit fact findings, and neither party timely requested findings and conclusions from the trial court, we are to imply the necessary fact findings that would support the trial court's ruling if the evidence supports those findings. *Garcia-Cantu*, 253 S.W.3d at 241. Support for the implied findings usually must come only from the evidence produced during the hearing on the motion to suppress. *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). However, when the suppression issue is relitigated at trial, as it was here, the appellate court must consider the evidence from both the suppression hearing and the trial. *Id*.

When reviewing a motion to suppress in a juvenile case, we are to use the same bifurcated standard applicable to the review of suppression motions in adult criminal cases. *See R.J.H.*, 79 S.W.3d at 6; *In re A.M.*, 333 S.W.3d 411, 414-15 (Tex. App.—Eastland 2011, pet. denied); *In re D.G.*, 96 S.W.3d 465, 467 (Tex. App.—Austin 2002, no pet.). We give almost total deference to a trial court's determination of historical facts and mixed questions of law and fact (explicit or, as here, implied) that rely upon the credibility of a witness, but apply a de novo standard of review to pure questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Martinez*, 348 S.W.3d at 922 (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)); *see R.H.J.*, 79 S.W.3d at 6-7.

**ANALYSIS**

The Texas Family Code governs the admissibility of statements made by juveniles. *See* Tex. Fam. Code § 51.095. Generally, statements made by juveniles are admissible in evidence only if the statement shows that the child has, at some time before the making of the statement, received from a magistrate a warning that: (i) the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child; (ii) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning; (iii) if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and (iv) the child has the right to terminate the interview at any time. *Id*. § 51.095(a)(1), (5). However, these admonishments are not required if, at the time the statement is made, the juvenile is not being subjected to custodial interrogation. *See id*. § 51.095(b), (d); *see also Martinez v. State*, 131 S.W.3d 22, 32 (Tex. App.—San Antonio 2003, no pet.) ("[A] statement which is not the product of custodial interrogation is not required to be suppressed, even when the juvenile does not receive the statutory admonishments."). In this case, because it is undisputed that C.M.A. did not receive the required statutory admonishments prior to making his statements, the dispositive issue is whether C.M.A. was in custody at the time he was interviewed.

"In making the custody determination, the primary question is whether a reasonable person would perceive the detention to be a restraint on his movement 'comparable to . . . formal arrest,' given all the objective circumstances." *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)). Stated another way, "[a]

7

person is in custody if, under the totality of the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254-55 (Tex. Crim. App. 1996); *Bartlett v. State*, 249 S.W.3d 658, 668 (Tex. App.—Austin 2008, pet. ref'd). In evaluating whether a reasonable person would believe his freedom has been restrained to the degree of a formal arrest, we are to look only to the objective facts surrounding the detention. *Ortiz*, 382 S.W.3d at 372 (citing *Dowthitt*, 931 S.W.2d at 255). "The subjective beliefs of the detaining officer are not included in the calculation of whether a suspect is in custody." *Id*. at 372-73. However, "if the officer manifests his belief to the detainee that he is a suspect, then that officer's subjective belief becomes relevant to the determination of whether a reasonable person in the detainee's position would believe he is in custody." *Id*. at 373. On the other hand, "any undisclosed subjective belief of the suspect that he is guilty of an offense should not be taken into consideration—the reasonable person standard presupposes an 'innocent person.'" *Id*.

When the person being questioned is a juvenile, the above analysis is slightly modified. The juvenile's age must be taken into consideration in the "reasonable-person" analysis, so long as the child's age is known to the officer at the time of questioning, as it was here. *See J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2406 (2011). "This is not to say that a child's age will be a determinative, or even a significant, factor in every case." *Id*. "It is, however, a reality that courts cannot simply ignore." *Id*. Therefore, as this Court has previously held, the standard for determining whether a juvenile is in custody is "whether, based upon the objective circumstances, a reasonable child of the same age would believe [his] freedom of movement was significantly restricted." *In re L.M.*, 993 S.W.2d 276, 289 (Tex. App.—Austin 1999, pet. denied).

8

In this case, there are some facts and circumstances that the district court might have found and which suggest that a reasonable fourteen-year-old would believe that his freedom of movement had been significantly restricted. The evidence summarized above tends to show that in both interviews, C.M.A. was removed from class and told to go to the principal's office—a place where a reasonable fourteen-year-old student might feel at least some degree of restraint—and escorted to a room within the principal's office by either the principal or the principal's secretary, either of whom a reasonable fourteen-year-old student might view as an authority figure. Once inside the room, the door was closed, and C.M.A. was questioned by a sheriff's deputy who may or may not have been wearing his uniform, but who was at the very least wearing his badge and his firearm (although, again, there was no evidence presented on whether or how the firearm was displayed to C.M.A.), and was informed by the deputy that he was a suspect in two serious crimes—burglary in the first interview and sexual assault of a child in the second interview. Also, during the second interview, the deputy was accompanied by an investigator from Child Protective Services, and C.M.A. was told during this interview that the deputy and the investigator had already spoken with the alleged victim. Moreover, during the second interview, both Beathard and Hollas testified that they did not inform C.M.A. that he was free to terminate the interview and leave the room at any time.[5] In summary, there was evidence that C.M.A., a fourteen-year-old child, was alone

---

[5] In his brief, C.M.A. also argues that another circumstance that we should consider in our analysis is that C.M.A., according to the trial testimony of a school counselor, was "on meds." However, the counselor also testified that she did not know the "specifics" of the medicine that C.M.A. was taking or why he was taking it, and there is no evidence in the record as to whether C.M.A. was under the influence of the unspecified medicine during the interviews, or, even if he was, how such medicine would affect a reasonable fourteen-year-old's belief of whether his freedom of movement was significantly restricted.

in a closed room inside the principal's office during the first interview with one adult authority figure, and during the second interview with two adult authority figures, and was being questioned by the adult authority figures about their suspicion that he had committed serious crimes.

However, in this case, there are additional facts and circumstances that, viewed through our applicable standard of review, support the district court's conclusion that a reasonable fourteen-year-old in C.M.A.'s position would not believe that his freedom of movement was restrained to the degree associated with a formal arrest. First, there was evidence that during both interviews, C.M.A. was expressly told that he was not under arrest. During the first interview, there was likewise evidence that C.M.A. was also told that he did not need to speak with Beathard and was free to leave the room at any time. Although this information was not expressly conveyed to C.M.A. during the second interview, the district court could have reasonably inferred that such information was implicitly conveyed when C.M.A. was told that he was not under arrest, and the district court could have further reasonably inferred that a reasonable fourteen-year-old would believe that he had the same freedom to leave during the second interview that he had during the first interview, especially since Beathard was again conducting the interview and Beathard had allowed C.M.A. to return to class following the first interview. Also, according to Beathard, C.M.A. "already knew" him prior to the first interview, which, the district court could have reasonably inferred, would have made a reasonable fourteen-year-old feel less restrained around Beathard than he would have felt around other law enforcement officers whom he did not know. Additionally, the room in which the interviews took place was not an interrogation room at a police station, but was described instead as "set up like a conference room" that was approximately 25 to 30 feet long and 15 to 20 feet wide. The room had windows, and the door to the room also had what was described as an "observation

10

window." Although the door was closed during the interviews, it was not locked. The room contained what was described as a "big table," and, during the interviews, C.M.A. was seated on the side of the table that was closest to the door. Moreover, Beathard and Hollas also testified that they were seated at the table during the interviews, but not on the same side of the table as C.M.A., which, the district court could have reasonably inferred, would make a reasonable fourteen-year-old feel less restrained. Additionally, the evidence, when viewed in the light most favorable to the district court's ruling, tends to show that C.M.A. was not handcuffed during either interview, he had not been escorted to the room by law enforcement officers, he was not denied "basic necessities" during the interviews, and he was not threatened or promised anything during the interviews. And, although C.M.A.'s parents were not present during the interviews, the evidence tends to show that C.M.A. did not ask to speak with his parents. The evidence also tends to show that C.M.A. did not ask to leave the room, go to the bathroom, or get a drink of water during either interview. Finally, the first interview lasted approximately thirty minutes, while the second interview lasted approximately twenty minutes, and once the interviews were completed, C.M.A. was allowed to return to class. Based on this and other evidence, the district court could have reasonably inferred that the interviews were not so long or so intimidating as to make a reasonable fourteen-year-old believe that his freedom of movement had been significantly restricted. *See Meadoux v. State*, 307 S.W.3d 401, 409-12 (Tex. App.—San Antonio 2009), *aff'd on other grounds*, 325 S.W.3d 189 (Tex. Crim. App. 2010); *In re M.R.R.*, 2 S.W.3d 319, 323-25 (Tex. App.—San Antonio 1999, no pet.).

We are to sustain the trial court's ruling if it is "reasonably supported by the record," and we can overturn the ruling only if it is "outside the zone of reasonable disagreement." *See Martinez*, 348 S.W.3d at 922; *Valtierra*, 310 S.W.3d at 448. Based on the totality of the objective

11

circumstances summarized above, and viewing the evidence and all reasonable inferences therefrom in the light most favorable to the suppression ruling, the district court's determination that a reasonable fourteen-year-old would not have believed that his freedom of movement was significantly restricted during either the first or second interview was "reasonably supported by the record" and was not "outside the zone of reasonable disagreement." Accordingly, we cannot conclude that the trial court abused its discretion in denying the motion to suppress on the ground that C.M.A. was not in custody during either interview. We overrule C.M.A.'s first and second points of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Field

Affirmed

Filed:   July 2, 2013